UNITED STATES of America

v.

**Jelani A. LEE a/k/a C–Lo a/k/a Omar Martin**

**Jelani A. Lee, Appellant.**

**Nos. 07–1406, 07–4643.**

United States Court of Appeals, Third Circuit.

Argued March 10, 2009.

Opinion Filed: July 17, 2009.

Michael N. Huff, Esq., (Argued), Philadelphia, PA, for Appellant.

Patrick L. Meehan, Esq., Mark S. Miller, Esq., (Argued), Robert A. Zauzmer, Esq., Office of United States Attorney, Philadelphia, PA, for Appellee.

Before: FUENTES, CHAGARES, and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge:

Jelani Lee appeals from his conviction for possession with intent to distribute cocaine base ("crack") in violation of 21 U.S.C. § 841. Lee's principal argument is that the District Court should have declared a mistrial after the jury discovered an inculpatory document that was never provided to defense counsel. Because we find that Lee's defense was irredeemably undermined by this discovery, we conclude that the jury's verdict is not one in which we can have confidence. Accordingly, we will vacate Lee's conviction and remand for a new trial.

### I.

#### A.

Early in the evening of January 7, 2005, Lancaster police officers stopped the car Lee was driving. Co-defendants Tommie Spurill and James Kollore were also in the car, as was Linsey Boyer, a woman Spurill met at a bar the previous evening. The occupants of the car were searched and the officers found crack cocaine in Boyer's undergarments. Boyer claimed that the drugs belonged to Lee and Kollore, and all four were arrested.

When she was interviewed by the police, Boyer told the officers that Spurill had called her cell phone earlier in the day from a local motel. When the officers called the number stored in Boyer's phone, a representative from a local Red Carpet Inn answered. After his arrest, Lee was searched and the officers found keys with tags reading "34" and "42" in Lee's pocket. Lee told the officers that he was from New York, but that his address in Lancaster was 402 South Queen Street.

The officers went to the Red Carpet Inn and interviewed Kalpana Patel, one of the franchise owners. She provided the officers with a registration card for room 42. The front of the card indicated that the room had been rented to "Omar Martin" for one night on January 3, 2005, and listed 402 South Queen Street, Lancaster as Martin's address. The back of the card indicated that Martin had extended his stay through January 7, but the record is silent about whether the officers were aware of the back of the card. The officers showed Patel a photo array and she identified Lee as someone she knew. Based on this information, the officers obtained a warrant to search room 42. There, the officers found substantial quan-

tities of crack cocaine, cash, a digital scale, and plastic baggies.

The Lancaster Police turned the case over to federal authorities and Lee, Spurill, and Kollore were indicted for possession of 32.8 grams of crack with intent to distribute. Lee was also indicted for possession of 200.7 grams of crack with intent to distribute. The Lancaster Police made photocopies of the evidence they had obtained for the United States Attorney's Office. However, they only photocopied the front of the hotel registration card, which indicated that "Martin" had rented room 42 for one night on January 3, 2005. The prosecutor then provided this evidence to defense counsel, which included a photocopy of only the front of the registration card.

### B.

At trial, Lee attempted to show that "Martin"—whether identified as Lee or someone else—had checked out of the Red Carpet Inn days before drugs were found. Patel provided the primary testimony linking Lee to the Red Carpet Inn. She testified as follows: On about January 7, 2005, Lancaster police officers came to her hotel with keys to rooms 34 and 42. The key to room 34 had been missing for a few weeks. Patel answered affirmatively when asked: "Room 42 on the early morning when the police came out and interviewed you had that room been rented at that time?" When asked who was staying in the room, Patel testified that "I think—maybe—person staying for two or three days, I don't remember that." June 2008 Supp.App. at 386. All Red Carpet Inn guests are required to fill out a registration card.

After this testimony, counsel for the Government removed the original—double sided—Red Carpet Inn registration card from an envelope and handed it to Patel. Patel identified the card as the registration card for room 42 and testified that the name on the card was "Omar Martin." Martin wrote on the card that his address was 402 South Queen Street in Lancaster. Patel filled in the arrival date of January 3, 2005. Nothing was written on the line next to "departure date," but the numeral "1" was written next to "# of days." When asked about the significance of the blank next to "departure date," Patel responded, "I just write it down, you know, number of the days, so I writed [sic] it down, one." June 2008 Supp.App. at 391. Martin had previously rented room 34, but Patel did not remember when. Martin told her that he lost the key to room 34.

In addition, Patel testified that the police came back the next day and showed her photographs. She picked one of the photographs as someone she knew.

When Patel was cross-examined by defense counsel, she repeatedly testified that the registration card indicated that Martin stayed for only one day, January 3, 2005. Patel acknowledged that she was the one who filled in the number of days Martin had stayed. If a guest wanted to stay longer he would let Patel know: "If they wanted to stay—you know—longer than one night, they're telling us." June 2008 Supp.App. at 409. She would then indicate that a guest had asked to stay longer and paid for the extra nights by marking it on the registration card. However, she did not have a registration card indicating that Martin was staying at the hotel at the time the drugs were found. Guests did not check out when they were ready to leave; they paid in advance and simply left at the end of their stays. By the time of trial, Patel testified that she did not specifically remember Lee, but she did recall identifying someone.

The Government also presented evidence that keys marked "34" and "42"

were found when Lee was searched, that Lee had claimed 402 South Queen Street—an apartment complex—as his local address, and that Spurill had made a phone call from the Red Carpet Inn on the afternoon of January 7.

The parties stipulated that two bags of cocaine base were recovered from Boyer. The smaller bag contained 7.5 grams of cocaine base divided into nineteen baggies. The larger bag contained 25.3 grams of cocaine base divided into forty-five baggies. The parties also stipulated that 54.1 grams of cocaine base divided into 100 baggies were recovered from a backpack in Room 42, and that 146.6 grams of cocaine base were recovered from bags under the bed in Room 42.

## C.

Just before deliberations began, the jury was provided with the trial exhibits, including the original copy of the hotel registration card. During its deliberations, the jury asked the following question: "What is the information on the back of the registration card in pencil?" June 2008 Supp. App. at 428. This was the first time the parties, their counsel, or the District Court realized that the registration card was a double-sided document. The back of the card contained dates handwritten by an unidentified person, suggesting that Martin had been registered in Room 42 when the drugs admitted against Lee were found there. This information completely undermined Lee's defense that he was not in the room on January 4, 5 or 6, 2005.

Lee objected that he was not provided the back of the card before trial and requested a mistrial. The District Court denied the motion, finding that "I don't think that if there is any problem there, it's certainly not anything that can't be cured by an instruction and—and juries follow these instructions all the time and

the law presume[s] they do." June 2008 Supp.App. at 434.

The District Court then called the jury into the courtroom and gave the following instruction:

I have examined the—both sides of the document and I can instruct you and will instruct you that there has been no testimony as to the meaning of the notations on the back of the card. The testimony only had to do with the document as represented on the front of the card.

And there is no evidence before you and no testimony as to the meaning of the notations on the back of the card.

And I'm going to direct you to disregard the notations on the back of the registration card and not consider that as part of the evidence in the case when you're evaluating the evidence and deliberating on your verdict.

June 2008 Supp.App. at 435.

## II.

■ Lee claims that the Government's failure to provide the reverse of the registration card was a violation of Federal Rule of Criminal Procedure 16, regarding criminal discovery, that could only be remedied through a new trial. A trial court's remedy for a discovery violation under its supervisory powers is reviewed for abuse of discretion while factual findings upon which the decision was based are reviewed for clear error. *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 258 (3d Cir.2005).

## A.

Rule 16 provides that:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs,

tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; [or] (ii) the government intends to use the item in its case-in-chief at trial.

Fed.R.Crim.P. 16(a)(1)(E).

■■■ The Government does not dispute that Rule 16 required it to disclose the back of the registration card and that it failed to do so before trial.[1] In fact, the Government concedes that the reverse of the registration card "would entirely defeat Lee's [defense] argument." Appellee's Br. at 57. Instead, the Government argues that it met its Rule 16 obligation by providing defense counsel with *access* to the original exhibit during and after trial. While the Government is correct that defense counsel could have averted this issue by examining the original exhibit before it was submitted to the jury, this does not alter the fact that the Government had a duty to provide an accurate copy before trial. Although it may be sound practice, defense counsel is not required to inspect every exhibit at trial to ensure that docu-

ments that appear to conform to the copies provided by the Government are in fact identical.[2] Instead, Rule 16's discovery requirements made it reasonable for defense counsel to rely on the Government to provide, in the first instance, an accurate copy of the evidence offered at trial.

■■■ When a party fails to comply with Rule 16, the district court is empowered to order that party to comply with the Rule, grant a continuance, exclude the evidence, or enter other just relief. Fed.R.Crim.P. 16(d)(2). In determining an appropriate remedy, a district court should consider the reasons for the party's delay in producing the materials, including whether it acted intentionally or in bad faith, and the degree of prejudice to the opposing party. *United States v. Ganier*, 468 F.3d 920, 927 (6th Cir.2006); *see also Fahie*, 419 F.3d at 258–59. Accordingly, we must consider whether Lee was prejudiced by the discovery violation and, if so, what remedy was required.

**B.**

■■■ On appeal, a new trial is warranted to remedy a discovery violation where

---

1. The United States Attorney's Office did not have actual physical possession of the original registration card until the time of trial. However, the Government admits that the original card was sufficiently within its possession to trigger Rule 16's disclosure requirements. *See United States v. Risha*, 445 F.3d 298, 303–06 (3d Cir.2006) (setting forth test for determining whether federal prosecutor has constructive possession of evidence held by local agents). Indeed at a pretrial hearing, the Government asserted that a Lancaster Police Detective was the "prosecuting officer" and that "[i]t would be no different than in any other case where we have a Federal agent who is the case agent." June 2008 Supp.App. at 6.

2. "It is ordinarily the responsibility of counsel to check the exhibits and failure to object in a timely manner can under some circumstances

constitute a waiver." *Gov't of Virgin Islands v. Joseph*, 685 F.2d 857, 864 (3d Cir.1982). However, this rule is generally limited to circumstances in which defense counsel failed to discover that entire additional documents were sent to the jury, *see, e.g., id.*, or that *known* inadmissible portions of documents were not properly redacted, *see, e.g., United States v. Strassman*, 241 F.2d 784, 785–86 (2d Cir.1957). Here, in contrast, application of this rule would require defense counsel to search every exhibit for *unknown* extraneous matter never included in copies provided by the Government. Cf. *United States v. Brandenburg*, 155 F.2d 110, 113 (3d Cir.1946) (granting defendant new trial where "[c]asual inspection by defense counsel before [exhibits marked by the Government with prejudicial annotations] went into . . . evidence" failed to reveal the annotations).

"'the remedy offered by the district court was inadequate to provide [the defendant] with a fair trial.'" *United States v. Lopez,* 271 F.3d 472, 483 (3d Cir.2001) (quoting *United States v. Miller,* 199 F.3d 416, 420 (7th Cir.1999)) (alteration in original).[3] To determine whether the district court's remedy was adequate, "'[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *United States v. Mitchell,* 365 F.3d 215, 254 (3d Cir.2004) (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (discussing standard for granting a new trial after a *Brady* violation)).

▮▮▮ In evaluating the prejudice to Lee, we must consider whether the discovery violation in this case caused jury contamination. "[E]xposure to extrinsic information deprives a criminal defendant of the protections of the Sixth Amendment, including his right of confrontation, of cross-examination, and of counsel." *United States v. Ofray–Campos,* 534 F.3d 1, 18 (1st Cir.2008) (internal quotation marks omitted) (vacating conviction because district court provided extrinsic information to the jury during deliberations); *see also Farese v. United States,* 428 F.2d 178, 180 (5th Cir.1970) (stating that jury "[e]xposure to evidence through discovery of secreted material is not subject to [Sixth Amendment] safeguards"). Thus, "[i]t is perfectly plain that the jury room must be kept free of evidence not received during trial, and that its presence, if prejudicial, will vitiate the verdict." *Gov't of Virgin Islands v. Joseph,* 685 F.2d 857, 863 (3d Cir.1982) (internal quotation marks omitted) (holding that providing jury with a signed confession that was not admitted into evidence during deliberations violated defendant's due process rights). This rule equally applies to material submitted to the jury through inadvertent attachment to properly admitted evidence. *See, e.g., Farese,* 428 F.2d at 182 (finding "strong probability of prejudice" to defendant when jury found cash—undiscovered by the Government or defense counsel—hidden in a trial exhibit); *United States v. Brandenburg,* 155 F.2d 110, 113 (3d Cir. 1946) (granting defendant new trial where exhibits marked by the Government with prejudicial annotations were sent to the jury).

The Government argues that Lee cannot demonstrate prejudice because the reverse of the registration card was inculpatory rather than exculpatory. If not for the discovery violation, the Government would have used the reverse of the registration card in formulating its case against Lee, strengthening its position. Because the District Court instructed the jury to ignore the back of the registration card, the Government believes that it did not obtain the benefit of this inculpatory evidence and that Lee was not harmed by presenting a defense that was inconsistent with the reverse of the card. This argument is based on the assumption that the jury was able to follow the District Court's instruction to disregard the reverse of the registration card. We cannot accept that assumption in this case.

▮▮▮ We do presume that juries follow their instructions. *See, e.g., Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *United States v. Bornman,* 559 F.3d 150, 156 (3d Cir.2009). This rule "is a pragmatic one, rooted less in the absolute certitude that the presump-

---

**3.** In *Lopez* we declined to specify the parameters of the prejudice inquiry because the defendant made no effort to show prejudice. 271 F.3d at 484.

tion is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702. However, the rule is not absolute; we will not blindly assume that a jury is able to follow a district court's instruction to ignore the elephant in the deliberation room. *See, e.g., United States v. Morena*, 547 F.3d 191, 197 (3d Cir.2008) (holding that limiting instruction was not sufficient to cure prejudice resulting from persistent prosecutorial misconduct). For example, in the context of a jury tainted by extrarecord material, we found that it was not reasonable to assume without inquiry that the jury would be able to follow an instruction to ignore the external material. *Gov't of Virgin Islands v. Dowling*, 814 F.2d 134, 138 (3d Cir.1987). In *Dowling*, we held that:

> Where there is affirmative reason to believe that a member or members of the jury may have learned extra-record information about the underlying facts of the case ... that has a potential for adversely affecting the jury's ability to impartially decide the case on the record evidence alone, the trial court has a duty to determine whether the trial should be aborted or whether the jury, with proper instructions, can be relied upon to judge impartially and to confine its deliberations to the record evidence.

*Id.* at 138. In *Dowling*, the district court asked the jurors to identify themselves if they had received extra-record information that had rendered them incapable of giving a fair trial to either side. *Id.* at 141. We held that this question was inadequate to establish that the jurors would be able to disregard any extra-record material they had been exposed to, and remanded for a new trial. *Id.*

■ The risk that a jury will be unable to follow the court's instruction to ignore information depends on a number of factors including the strength of the proper evidence against the defendant, the nature of the information, and the manner in which the information was conveyed. *See Moore v. Morton*, 255 F.3d 95, 119–20 (3d Cir.2001); *Dowling*, 814 F.2d at 138. *Cf. United States v. Urban*, 404 F.3d 754, 778 (3d Cir.2005) (listing factors relevant to determining prejudice in a jury contamination case).

The Government's evidence connecting Lee to the hotel room, apart from the reverse side of the hotel registration card, was relatively weak. Keys marked "34" and "42" were found when Lee was searched, but it was undisputed that Lee was no longer staying in room 34; someone who was later in a car with Lee made a phone call from the Red Carpet Inn; and the clerk at the Red Carpet Inn recognized Lee as someone she knew. In contrast, the reverse of the registration card strongly supported an inference that Lee was still renting the room when the drugs were found. As previously stated, the Government admits that the reverse of the registration card "would entirely defeat Lee's [defense] argument." Appellee's Br. at 57.

The nature of the information on the reverse of the registration card and the manner in which it was conveyed also would have made it extremely difficult for the jury to ignore. The registration card itself was a properly admitted piece of evidence. Unlike information obtained by reading news reports or overhearing gossip about a defendant, this information would have had much of the credibility of properly admitted evidence. The timing of the jury's discovery of the notations on the back of the registration card also enhances the significance of the marks. The jury

discovered the card within the first few hours of its deliberations. The jury had continued access to the reverse of the card throughout its deliberations.

As to the nature of the information, Patel's cross-examination focused on the absence of markings on the registration card indicating that "Martin" extended his stay through the date on which the drugs were found. Thus, the jury was primed to see the information on the back of the registration card as particularly significant; it was the missing link in the prosecution's case and was central to the defendant's trial strategy.

Under these highly unusual circumstances, we find that it was clear error for the District Court to assume—at least without some inquiry—that the jury would be able to follow the Court's instruction to disregard the back of the registration card. The jury had already discovered the back of the registration card and evidently considered this information to be significant. The Government suggests that because the jury asked a question about the back of the card, they must not have understood its significance. To us, however, this question only highlights the fact that the jury found the information on the reverse of the card important and recognized that it was inconsistent with the evidence presented during the trial.

■■■■ Accordingly, we must consider the prejudicial effect of the jury's access to the reverse of the hotel registration card. In general, a new trial is required where prejudice resulting from a discovery violation is serious enough to adversely affect a court's ability to reach a just conclusion. *Cf. United States v. Starusko*, 729 F.2d 256, 262 (3d Cir.1984) (discussing standard for *Brady* violations). One way a discovery violation may do this is by interfering with the defendant's ability to prepare for trial and develop an intelligent defense

strategy. *See, e.g., United States v. Lanoue*, 71 F.3d 966, 976 (1st Cir.1995) (holding that new trial was required where use of undisclosed Rule 16 material "unfairly surprised the defense and deprived it of the opportunity to design an intelligent litigation strategy that responded to the [undisclosed evidence]"), *abrogated on other grounds by United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997); *United States v. Padrone*, 406 F.2d 560, 561 (2d Cir.1969) (per curiam) (granting new trial where non-disclosure of defendant's statement affected trial strategy); *United States v. Noe*, 821 F.2d 604, 607 (11th Cir.1987) (" '[W]here it is apparent ... that [the] defense strategy may have been determined by the failure to [disclose], there should be a new trial.' " (quoting *United States v. Rodriguez*, 799 F.2d 649, 651 (11th Cir.1986)) (second and third alterations in original)).

■■■■ That is not to say that the Government may never introduce evidence that was not disclosed before trial. Even undisclosed evidence that upsets a defendant's trial strategy may be admissible if the defendant has some opportunity to adjust his trial strategy and respond to the new evidence. *Compare United States v. Atisha*, 804 F.2d 920, 925 (6th Cir.1986) (holding that mistrial not required when, on second day of trial, the Government informed defense counsel that it would present evidence of newly discovered overt acts to prove conspiracy charge and there was time for counsel to prepare cross-examination; new evidence did not undermine basis of defense strategy); *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if *Brady* material is disclosed in time for its effective use at trial."); *and United States v. Edmonson*, 962 F.2d 1535, 1546–47 (10th Cir.1992) (holding that grant of a seven day continuance for defense counsel to

evaluate new evidence was a sufficient remedy); *with Lanoue*, 71 F.3d at 979 (circumstances in which Government used undisclosed material "precluded [defense] counsel from using it to any effect"); *Padrone*, 406 F.2d at 561 (finding prejudice where Government made use of undisclosed inculpatory statements after defendant took the stand and testified inconsistently with statements); *and Noe*, 821 F.2d at 607 (same).

Here, Lee was deprived of any opportunity to prepare meaningfully for trial, to design an intelligent trial strategy, or to address the strongest evidence linking him to the drugs. First, although the markings on the reverse of the registration card create a clear inference that Lee extended his stay in Room 42 through the date of his arrest, Lee had no opportunity to challenge their authenticity or significance because they were not disclosed until after deliberations began. Second, as set forth above, Lee's trial strategy was to question the sufficiency of the Government's proof that Lee was connected with Room 42 at the time the drugs were found. The Government's proof on this point appeared weak, making this an intelligent strategy that might have been sufficient to create reasonable doubt as to Lee's guilt. Absent the discovery violation, Lee would have likely crafted a different trial strategy that might have proven more effective in light of the information on the back of the registration card. Finally, Lee might have chosen to enter into plea negotiations with the Government if he had accurate information about the strength of its case.

The prejudice Lee suffered extends beyond his lost opportunity to prepare an intelligent defense. Lee's trial strategy appeared deceptive in light of the information on the back of the registration card. If Lee had known about the back of the card, he—and his counsel—would not have been caught in an apparent deception by the jury during deliberations.

For these reasons, we find that the Government's failure to disclose the reverse side of the registration card interfered with Lee's substantial rights. The jury's verdict is not one in which we can have confidence. Accordingly, we conclude that the District Court abused its discretion in failing to grant a mistrial. The judgment of the District Court will be vacated and the case remanded for a new trial on both counts.[4]

### III.

Because we find that Lee is entitled to a new trial, the remaining issues he raises are moot. However, because the evidentiary issues he raises are likely to occur again at any subsequent trial, we will discuss them briefly.[5] Lee raises two evidentiary challenges. First, he maintains that the District Court erred in denying his motion to suppress physical evidence obtained during the stop of the car Lee was driving and from his hotel room. Second, he argues that the Government should not have been permitted to introduce evidence of one of Lee's prior convictions for drug distribution.

 With regard to the motions to suppress, we find that Lee did not have a

---

4. Count One related to the drugs in Room 42, and Count Two apparently related to the drugs in Lee's car. While the hotel registration card relates most directly to the drugs in Room 42, we find no basis in the record for distinguishing the prejudice Lee suffered on each Count.

5. However, because we are vacating Lee's conviction we will not discuss Lee's argument that the District Court erred in sentencing him.

reasonable expectation of privacy in Boyer's person. *Rawlings v. Kentucky*, 448 U.S. 98, 105–06, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (holding that defendant had no reasonable expectation of privacy in companion's purse). The initial stop of the vehicle was a proper traffic stop. After cocaine base was found on Boyer and she implicated Lee, the police had probable cause to arrest Lee, who was also driving with a suspended license. Lee has not identified any evidence or statements obtained from him before his arrest, and there is no basis to challenge evidence collected from Lee following his lawful arrest. Further, we find that the affidavit supporting the warrant to search Room 42 contained ample evidence to establish probable cause linking Room 42 to Lee and to narcotics trafficking. *See United States v. Whitner*, 219 F.3d 289, 297 (3d Cir.2000) (holding that probable cause linking crime and location to be searched may be established through "normal inferences").

■ Next, we find that the District Court did not abuse its discretion in admitting evidence of Lee's prior conviction. Evidence of prior bad acts cannot be admitted to show a propensity to violate the law. Fed.R.Evid. 404(b). However, it may be admitted "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The Supreme Court has set forth a four-part test for determining whether other crimes evidence was properly admitted: (1) the other crimes evidence must have had a proper purpose as set forth in Rule 404(b); (2) the proffered evidence must have been relevant; (3) its probative value must have outweighed its potential for unfair prejudice; and (4) the district court must have charged the jury to consider the other crimes evidence only for the limited purpose for which it is admitted. *United States v. Kellogg*, 510 F.3d 188, 199 n. 10 (3d Cir.2007) (citing *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).

■ "The parameters of Rule 404(b) are not set by the defense's theory of the case; they are set by the material issues and facts the government must prove to obtain a conviction." *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir.1992). In this case, Lee's prior drug trafficking conviction was properly admitted as evidence that Lee intended to distribute any drugs in his possession. Thus, the first three prongs of the test are satisfied.[6]

After the evidence was admitted, the District Court explained the limited role of the evidence, instructing the jury that "the evidence of prior drug convictions is admitted for the limited purpose of its relevance to you—if you find it relevant—as to the defendants' intent or state of mind in the possession of the drugs on January 7th, 2005, if you find after your deliberations, that any or all of them were in possession of drugs." App. at 142.5. In charging the jury, the District Court repeated this instruction.[7] Accordingly we find that the District Court did not abuse its discretion

---

**6.** We note that "to justify reversal of a District Court's balancing of probative and unfairly prejudicial qualities of evidence under Rule 403, the District Court's analysis and resulting conclusion must be 'arbitrary or irrational.'" *Kellogg*, 510 F.3d at 197 (internal quotation marks omitted).

**7.** Although Lee argues that this instruction "relieved the Government of its obligation to [prove] the Appellant's intent beyond a reasonable doubt" (Appellant's Br. at 20), the precise basis for Lee's objection is not clear. Because this argument was not raised before the District Court and we remand for a new trial, we need not discuss it further here.

in admitting evidence of Lee's prior drug trafficking offense.

### IV.

For the reasons expressed above, the judgment of the District Court will be reversed and the case remanded for a new trial on both counts.